UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN OWENS,<br>            Plaintiff,<br>    v.<br>D. FUGATE,<br>            Defendant. | Case No. 21-cv-02917-HSG<br><br>**ORDER DENYING DEFENDANT FUGATE'S MOTION FOR SUMMARY JUDGMENT; REFERRING CASE TO PRO SE PRISONER MEDIATION PROGRAM; STAYING ACTION; DIRECTIONS TO CLERK**<br><br>Re: Dkt. No. 20 |

Plaintiff, an inmate at Pelican Bay State Prison ("PBSP"), has filed a *pro se* action pursuant to 42 U.S.C. § 1983, alleging that PBSP officer C. Fugate retaliated against him in violation of the First Amendment. Defendant Fugate has filed a summary judgment motion. Dkt. No. 20. Plaintiff has not filed an opposition and defendant Fugate has not filed a reply, and the deadline to file both pleadings has passed. For the reasons set forth below, the Court DENIES defendant Fugate's motion for summary judgment.

## DISCUSSION

**I.    Factual Background**

    **A.    Complaint**

Plaintiff makes the following relevant allegations in his complaint. On October 23, 2019, Plaintiff filed a grievance against PBSP correctional officer Bellinger for misconduct and abuse of authority ("Bellinger Grievance"). In response, Officer Bellinger told Plaintiff that Plaintiff did not realize how difficult his prison time would be as long as he stayed in 7 Building on B Yard (also referred to B7 Building). Dkt. No. 1 at 5. PBSP correctional officers retaliated against Plaintiff for filing the Bellinger Grievance by conducting back-to-back searches of his cell on

1  November 21, November 22, and December 2, 2019.  Plaintiff was prevented from timely filing a
2  grievance regarding the excessive cell searches because correctional officers would repeatedly
3  claim that there were no grievance forms in the office.  Dkt. No. 1 at 5-6.
4  　　　　Defendant Fugate retaliated against Plaintiff in the following ways.
5  　　　　Each time Plaintiff tried to obtain a grievance form from the office, defendant Fugate claim
6  would claim that there were no grievance forms available and would threaten to write Plaintiff up
7  for holding up the program.  Dkt. No. 1 at 6.
8  　　　　Defendant Fugate told Plaintiff that he would go out of his way to create a reason to write
9  Plaintiff up for a disciplinary violation.  Dkt. No. 1 at 6.
10  　　　　On or about January 11, 2020, other inmates told Plaintiff that defendant Fugate had been
11  campaigning to get Plaintiff removed from B7 Building since December 25, 2019 because of
12  Plaintiff's grievance activity, including the Bellinger Grievance.  Specifically, inmates Jones and
13  Drew reported that when they requested cell moves, defendant Fugate told them that he would
14  only accommodate cell move requests from the Black inmates if inmates Jones and Drew could
15  get Plaintiff to move out of B7 Building.  Dkt. No. 1 at 6-8.
16  　　　　On January 20, 2020, Plaintiff filed a grievance against defendant Fugate regarding his
17  retaliatory behavior.  The following day, defendant Fugate called Plaintiff to the B7 Building
18  rotunda, claiming that the lieutenant wanted to see Plaintiff.  When Plaintiff arrived at the rotunda,
19  there was no lieutenant, correctional officer, or counselor in the rotunda.  Defendant Fugate closed
20  the B7/C-Section main door and began to interrogate Plaintiff about the grievance that he had
21  filed.  Plaintiff quickly ended the situation by explaining that he did not want to speak to
22  defendant Fugate about the grievance, did not want to speak to defendant Fugate at all, wanted
23  defendant Fugate to stop harassing him, and wanted defendant Fugate to let him go back to his cell
24  so that he could get to computer class.  Dkt. No. 1 at 9-10.  Plaintiff states that defendant Fugate
25  had previously stated that he would look for any reason to issue a disciplinary violation to Plaintiff
26  so Plaintiff was worried that he would be issued a disciplinary violation for holding up the
27  program.  Plaintiff further states that defendant Fugate told him that he and the other B7 Building
28  correctional officers wanted Plaintiff out of the building because they did not like how Plaintiff

1  was constantly filing grievances against correctional staff. Dkt. No. 1 at 10.

### B.    Additional Background

Plaintiff was able to obtain grievance forms from the library even when unable to obtain the forms from the rotunda/office. However, Plaintiff says he cannot just walk to the law library and grab legal materials or forms. To go to the law library, Plaintiff is required to have a reason to be in that area, such as going to school or class. Dkt. No. 20-2 at 22. Plaintiff passed near the law library when he went to computer class, which was at least once a week. Dkt. No. 20-2 at 10, 22.

Plaintiff was not moved out of Building B7. As of October 1, 2021, when Plaintiff sat for his deposition, Plaintiff was still housed in Building B7. Dkt. No. 20-2 at 21. Neither inmates Jones or Drew, or another inmate Karl, took any action to get Plaintiff to move out of Building B7. Dkt. No. 20-2 at 13-14.

Defendant Fugate never issued a disciplinary writeup. Defendant Fugate would play "minor games" with Plaintiff to harass him, such as trying to close the main door before Plaintiff could get out and repeatedly telling him that things were now personal between them and that he would look for any little reason to write Plaintiff up for a disciplinary violation. Dkt. No. 20-2 at 11-12, 15.

## II.    Motion for Summary Judgment

### A.    Summary Judgment Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

### B. Legal Standard for First Amendment Retaliation

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote omitted). Prisoners may not be retaliated against for exercising their right of access to the courts. *See Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995).

A prisoner must at least allege that he suffered harm, since harm that is more than minimal will almost always have a chilling effect. *Rhodes*, 408 F.3d at 567-68 n.11; *see Gomez v. Vernon*, 255 F.3d 1118, 1127-28 (9th Cir. 2001) (prisoner alleged injury by claiming he had to quit his law library job in the face of repeated threats by defendants to transfer him because of his complaints about the administration of the library). The adverse action in the first element of a retaliation claim need not independently deprive the plaintiff (prisoner or not) of a constitutional right. *See, e.g., Mt. Healthy*, 429 U.S. 274, 283 (1977) (absence of right to continued employment does not

4

1    defeat claim for retaliatory firing for First Amendment expression); *see also Vignolo v. Miller*, 120
2    F.3d 1075, 1078 (9th Cir. 1997) (discharge from prison job for refusal to waive constitutional right
3    states claim despite no constitutional right to prison job). Harm that "would chill a 'person of
4    ordinary firmness' from complaining" is sufficient. *Shepard v. Quillen*, 840 F.3d 686, 691 (9th
5    Cir. 2016) (quoting *Rhodes*, 408 F.3d at 569) (placement in administrative segregation or even
6    threat to do so on its own amounts to adverse action satisfying the first element). The threat of
7    harm can be a sufficiently adverse action to support a retaliation claim. *Id.* at 688-89; *Brodheim v.*
8    *Cry*, 584 F.3d at 1270. The prisoner need not demonstrate a total chilling of his First Amendment
9    rights to establish a retaliation claim. *See Rhodes*, 408 F.3d at 568-69 (rejecting argument that
10   inmate did not state claim for relief because he had been able to file inmate grievances and
11   lawsuit). That a prisoner's First Amendment rights were chilled, though not necessarily silenced,
12   is enough. *Id.* at 569 (destruction of inmate's property and assaults on inmate enough to chill
13   inmate's First Amendment rights and state retaliation claim, even if inmate filed grievances and
14   lawsuit).

**C.     Analysis**

16   Defendant Fugate does not address, or otherwise dispute, elements two, three, four and five
17   of the First Amendment retaliation claim. He focuses solely on the first element – whether he
18   took adverse action against Plaintiff. Defendant Fugate argues that he is entitled to summary
19   judgment because the harms alleged – refusal to give Plaintiff grievance forms, an alleged
20   campaign to remove Plaintiff from Building B7, alleged threats to write up Plaintiff for a
21   disciplinary violation, and an allegedly threatening conversation in the rotunda – are de minimis,
22   non-actionable harms that fail to state a First Amendment retaliation claim. Specifically,
23   defendant Fugate makes the following arguments. First, forcing Plaintiff to get grievance forms
24   from the law library, rather than the rotunda office, was a trivial inconvenience that would have
25   had no material impact on Plaintiff's ability to file grievances. Second, the denial of other
26   inmates' cell move requests constituted adverse action against those inmates, not against Plaintiff;
27   and were a *de minimis* harm because none of these inmates took adverse action against Plaintiff.
28   Third, the threats did not rise above the *de minimis* level because defendant Fugate's actions were

trivial in nature in that he threatened Plaintiff with only "minor" infractions and only played "minor" games; and because defendant Fugate did not follow through on these threats. Fourth, the conversation in the rotunda was not actionable because threatening a minor disciplinary write-up is a *de minimis* harm, defendant Fugate did not physically touch Plaintiff or attempt to do so and could not have done so because they were separated by a concrete wall with a small peephole, and Plaintiff was not trapped in some sort of hidden room. Dkt. No. 20 at 10-12.

Defendant Fugate is not entitled to summary judgment. Defendant Fugate has incorrectly characterized the governing law, and misleadingly ignored the cumulative effect of the actions alleged.

Defendant Fugate argues that the alleged threats constitute, at most, *de minimis* harm and not an adverse action because defendant Fugate did not carry out any of his threats and there was no physical harm. Ninth Circuit law states the opposite. The Ninth Circuit has clearly held that a prisoner need not show harm to succeed on a First Amendment retaliation claim, as long as there is a chilling effect, and held that "the mere threat of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect." *Brodheim*, 584 F.3d at 1270. The threat of harm need not be explicit or specific to constitute an adverse action. *Id.* "The power of a threat lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat." *Id.* at 1271.

A First Amendment retaliation claim does not require that the prison official carry out his threats or cause physical harm. Defendant Fugate's threats constituted an adverse action in violation of the First Amendment because, making all reasonable inferences in Plaintiff's favor at this stage, they caused him to feel apprehensive. Defendant Fugate threatened to have Plaintiff written up for disciplinary violations and urged other inmates to convince Plaintiff to move away from Building B7. If defendant Fugate had followed through on these threats, there would have been a significant negative effect on Plaintiff. A write up for a minor disciplinary violation can result in various kinds of punishment, including a loss of good-time credit; suspension of privileges such as receiving packages, canteen purchases, dayroom time, or receiving visitors; or confinement to quarters. 15 Cal. Code Regs. § 3314(e). The loss of good-time credits delays an

6

inmate's parole hearing date and/or release from prison. Given the restrictive nature of prison life, the suspension of privileges or confinement to quarters can drastically alter the quality of an inmate's life. If other inmates had been convinced to help move Plaintiff away from the building, they might attempt to persuade Plaintiff by attacking him or intimidating him. Dkt. No. 20-2 at 13. A jury could reasonably conclude that living under the constant threat of having his parole hearing date or release date pushed back, living a more restrictive life without privileges, and being attacked by other inmates would have a chilling effect on Plaintiff.

Finally, defendant Fugate's actions should not be viewed separately and in isolation. Plaintiff has described defendant Fugate repeatedly informing him that he wanted to retaliate against Plaintiff for filing grievances against prison staff; repeatedly telling other inmates that they would suffer, i.e. have their cell move requests denied, unless they convinced Plaintiff to move; and saying that he would find any reason to issue Plaintiff a disciplinary violation. Crediting Plaintiff's version of the facts, as the Court must at this stage, there is a triable issue of fact as to whether the threats reasonably caused Plaintiff to feel apprehensive because defendant Fugate interfered with and threatened various aspects of his life (i.e., his ability to easily file grievances, his ability to attend programming, his ability to retain good-time credits or privileges, and his ability to coexist peacefully with other inmates). The repeated and pervasive nature of these threats also could reasonably cause Plaintiff to believe that sooner or later defendant Fugate would carry out one or more of his threats or otherwise negatively affect Plaintiff's life. A jury could reasonably conclude that these actions had a chilling effect on Plaintiff.

Nor is defendant Fugate entitled to qualified immunity. Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests — "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). The doctrine thus intends to take into account the real-world demands on

officials in order to allow them to act "'swiftly and firmly'" in situations where the rules governing their actions are often "'voluminous, ambiguous, and contradictory.'" *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citing *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.* To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232. Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. To the extent there are factual disputes regarding what the defendant actually did, at the summary judgment stage the Court must resolve those disputes in plaintiff's favor in assessing whether defendant's conduct violated a clearly established right. *See Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (first prong of qualified immunity inquiry askes "whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" (citing to *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (alterations in original).

At the time that Fugate acted in 2019, *Shepard* and *Brodheim* clearly established that the threat of harm can satisfy the adverse action element of First Amendment retaliation claim. *Shepard*, 840 F.3d at 691 ("A jury could certainly find that the threat of administrative segregation would chill a 'person of ordinary firmness' from complaining about offer misconduct.") (quoting *Rhodes*, 408 F.3d at 569); *Brodheim*, 584 F.3d at 1270 ("Thus, the mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect.") (emphasis in original). In *Brodheim*, the Ninth Circuit specified that the prisoner-plaintiff need not establish an "explicit, specific threat of discipline or transfer if he failed to comply;" rather, the question is whether, "the record, taken in the light most favorable to the plaintiff, reveals statements by the defendant that a reasonable factfinder could . . . interpret as intimating

8

that some form of punishment or adverse regulatory action would follow." *Brodheim*, 584 F.3d at 1270.  In *Brodheim*, the inmate plaintiff submitted an interview request to correctional officer Cry, disputing Cry's categorization and rejection of a grievance regarding correctional officer Hearsum. Cry rejected the request and added the following handwritten notation: "The 695 rejection forms as noted.  Untimely for a 5-10-01 issue.  I'd also like to warn you to be careful what you write, req[u]est on this form."  The Ninth Circuit held that a plaintiff could prevail on a retaliation claim where "'the record, taken in the light most favorable to the plaintiff, reveals statements by the defendant that a reasonable factfinder could . . . interpret as intimating that some form of punishment or adverse regulatory action would follow.'" *Id.* at 1270 (citing *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003)).  The Ninth Circuit reversed the district court's finding that Brodheim had produced inadequate evidence of an adverse action.  The Ninth Circuit held that there was a genuine issue of fact as to whether Cry's handwritten notation intimated that some form of punishment or adverse regulatory action would follow a failure to comply, and suggested that if the jury so found, that conduct could satisfy the adverse action element of a First Amendment retaliation claim. *Id.* at 1270-71.

Similar to *Brodheim*, viewing the record in the light most favorable to Plaintiff and accepting his version of events as true, there is a triable issue of fact as to whether defendant Fugate's harassment and threats constituted adverse actions because they could be viewed as intimating that some form of punishment or adverse regulatory action would follow.  And if Plaintiff's version of the facts is shown to be true, any reasonable officer would have known that such threats violated Plaintiff's constitutional rights.

For the foregoing reasons, the Court DENIES defendant Fugate's motion for summary judgment.

## CONCLUSION

For the reasons set forth above, the Court orders as follows.

1. The Court DENIES defendant Fugate's motion for summary judgment.  Dkt. No. 20.

2. The case is hereby REFERRED to Magistrate Judge Robert Illman for settlement

proceedings pursuant to the Pro Se Prisoner Mediation Program. Such proceedings shall take place within 120 days of the date this order is filed, or as soon thereafter as Magistrate Judge Illman's calendar will permit. Magistrate Judge Illman shall coordinate a place, time and date for one or more settlement conferences with all interested parties and/or their representatives and, within fifteen days of the conclusion of all settlement proceedings, shall file with the Court a report thereon. The Clerk is directed to serve Magistrate Judge Illman with a copy of this order and to notify Magistrate Judge Illman that a copy of the Court file can be retrieved from the Court's electronic filing database.

3. In view of the referral, further proceedings in this case are hereby STAYED. The Clerk shall ADMINISTRATIVELY CLOSE this case until further order of the Court. If the case is not settled, the Court will enter a new scheduling order for further proceedings.

This order terminates Dkt. No. 20.

**IT IS SO ORDERED.**

Dated: 2/16/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge